## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| R.D. Offutt Farms Co., | Civil File No.: _____ |
| | Judge: _____ |
| Plaintiff, | |
| v. | |
| | **COMPLAINT** |
| White Earth Division of Natural Resources, Dustin Roy, in his official capacity as Director of White Earth Division of Natural Resources, and John Does in their official capacities as Conservation Officers for the White Earth Division of Natural Resources, | |
| Defendants. | |

## <u>INTRODUCTION</u>

Plaintiff R.D. Offutt Farms Co. ("Plaintiff" or "RDO" or "RDO Farms"), by and through its undersigned counsel, hereby submits this Complaint against Defendants White Earth Division of Natural Resources ("WEDNR"), Dustin Roy in his official capacity as WEDNR Director ("Roy"), and John Does in their official capacity as Conservation Officers for the White Earth Division of Natural Resources ("Conservation Officers") (collectively, "Defendants") seeking a Declaratory Judgment that Defendants do not have authority to regulate groundwater appropriations on irrigated lands owned or operated by RDO ("RDO Lands"). RDO Farms is family owned and operated and has been farming in Minnesota for 60 years, subject to regulation by the Minnesota Department of Natural Resources ("MN DNR") from which it obtains permits for its groundwater use. Despite RDO's 60-year history of sustainable farming in Minnesota and its compliance with MN

1

DNR regulatory requirements, Defendants adopted and recently started to enforce an ordinance requiring RDO to obtain permits from Defendants to continue irrigating RDO Lands.

The ordinance directly conflicts with the clear limitations and guidance set forth by the United States Supreme Court in *Montana v. United States*, 450 U.S. 544, 565 (1981) and *Plains Commerce Bank v. Long Family Land and Cattle Co.*, 554 U.S. 316, 328 (2008). As Chief Justice Roberts enunciated in *Plains Commerce Bank*, "tribes do not, as a general matter, possess authority over non-Indians who come within their borders: '[T]he inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe.'" 554 U.S. at 328 (quoting *Montana*, 450 U.S. at 565). Chief Justice Roberts further declared that "[t]his general rule restricts tribal authority over nonmember activities taking place on the reservation, and *is particularly strong* when the nonmember's activity occurs on land owned in fee simple by non-Indians." *Id.* (emphasis added) (citing *Strate v. A-1 Contractors*, 520 U.S. 438, 446 (1997), an opinion written by Justice Ginsburg for a unanimous Court).

Despite these Supreme Court pronouncements, on May 5, 2023, the White Earth Reservation Business Committee ("WERBC") passed an ordinance[1] allowing Defendants to regulate: (a) the withdrawal of groundwater by non-Indians on non-Indian owned lands

---

[1] On May 5, 2023, WERBC passed an ordinance requiring landowners and operators, including non-Indian landowners and operators, to submit permit applications to Defendants within one year for all high-capacity pumps and wells located both on the White Earth Reservation or within the appurtenant five-mile "buffer" area ("Water Ordinance" or "Ordinance"). A copy of the Water Ordinance is attached hereto as Exhibit 2.

within the boundaries of the White Earth Reservation ("Reservation"); and (b) the withdrawal of groundwater by non-Indians on non-Indian owned lands *outside* the boundaries of the Reservation. Defendants have made their position clear by asserting in Tribal Court filings that the Water Ordinance *preempts* MN DNR's groundwater regulatory program even on non-Indian owned lands located *outside* the boundaries of the Reservation in the area covered by the Ordinance.

Defendants' position not only contravenes United States Supreme Court precedents, but it also is wholly unnecessary because the State of Minnesota ("State") has effectively implemented a comprehensive groundwater regulatory program for almost 100 years and because expert analysis, including analysis by MN DNR, demonstrates that the area covered by the Water Ordinance has not experienced adverse impacts on groundwater resources.

Specifically, the Minnesota Legislature expressly authorized MN DNR to implement a comprehensive regulatory program, giving the MN DNR Commissioner the authority to administer "the use, allocation, and control of waters of the state.[2]" Minn. Stat. § 103G.255. The Legislature further gave MN DNR the power to "establish water appropriation limits to protect groundwater resources" (Minn. Stat § 103G.287, subd. 3), and specifically directs that permits not issue unless "the groundwater use is sustainable to supply the needs of future generations and . . . will not harm ecosystems, degrade water, or

---

[2] "'Waters of the state' means surface or underground waters, except surface waters that are not confined but are spread and diffused over the land," including "boundary and inland waters." Minn. Stat. § 103G.005, subd. 17.

reduce water levels beyond the reach of public water supply and private domestic wells." *Id.* at subd. 5.

As the baseline for its groundwater regulatory program, MN DNR requires entities seeking to withdraw groundwater for irrigation purposes on farms to first apply for and obtain groundwater appropriation permits from MN DNR. As another piece of its comprehensive regulatory program, MN DNR has the authority to "designate groundwater management areas and limit total annual water appropriations and uses within a designated area to ensure sustainable use of groundwater." Minn. Stat. § 103G.287, subd. 4. It did so by specially designating the Straight River Groundwater Management Area ("SRGWMA") in 2017.[3]

Just last month, in *April 2024*, MN DNR issued its 62-page Straight River Groundwater Management Area Monitoring and Analysis Report ("Straight River Groundwater Report"), attached hereto as Exhibit 4. MN DNR's Straight River Groundwater Report analyzed, in depth, past and present groundwater use and the sustainability of groundwater use for agricultural purposes in the area which includes RDO Lands located within the Reservation and the five miles outside of the boundaries of the Reservation. MN DNR declared at the outset of the Straight River Groundwater Report that:

> [MN DNR] continues to work in the Straight River
> Groundwater Management Area (SRGWMA) to address

---

[3] In 2017, MN DNR implemented the Straight River Groundwater Management Area Plan ("SRGWMA Plan") to guide MN DNR in managing the appropriation and use of groundwater within the SRGWMA for a five-year period. The SRGWMA Plan is attached hereto as Exhibit 3.

groundwater-related resource challenges. The [MN] DNR is responsible for ensuring that groundwater use remains sustainable. The [MN] DNR recognizes that groundwater use is vital to the people and economy of the state of Minnesota including those within the SRGWMA. . . . The [MN] DNR has expanded hydrologic and climate monitoring to evaluate if groundwater use is sustainable within the SRGWMA. Combined with historical studies and analysis, recent data analyses provide an understanding of how current and past water use affects surface water and groundwater resources.

Ex. 4 (Straight River Groundwater Report) at 7.

Tellingly, after conducting a thorough analysis with the mandate set forth above, MN DNR concluded, in no uncertain terms, that:

1. Groundwater baseflow provides 93-97% of streamflow throughout the SRGWMA.

2. Summer streamflow at the outlet of the SRGWMA has shown no downward trend.

3. **Aquifer levels have been stable and resilient through the extensive period of record, and the DNR is not concerned about long-term aquifer sustainability.**

Ex. 4 (Straight River Groundwater Report) at 58 (emphasis added).

Additional expert analysis further confirms MN DNR's conclusions in the Straight River Groundwater Report: there is no valid scientific evidence that RDO Farms' state-authorized groundwater withdrawals from RDO Lands for its farming operations have had a material adverse effect on groundwater resources, stream flows or lake levels. Specifically, expert analysis based on years of substantial and reliable data demonstrates:

• MN DNR is proactively managing the groundwater resource;

- Groundwater levels show no long-term decline despite increased irrigation in the Study Area[4];

- RDO Farms' operations do not affect lake levels or stream flow; and

- RDO Farms' current and historical groundwater withdrawals are sustainable.

*See* Ex. 1 (Davis Report) at 6.1-6.4.

These scientific facts, coupled with continued and focused oversight by MN DNR pursuant to its statutory authority and comprehensive regulatory programs, dispositively demonstrate that RDO Farms' groundwater withdrawals for use on RDO Lands have not had, and will not have, a direct effect on the political security, economic security, or health and welfare of the White Earth Band. Consequently, under clear Supreme Court precedent in *Montana v. United States*, 450 U.S. 544 (1981) and its progeny, and recent precedent by the United States Court of Appeals for the Eighth Circuit in *Mandan, Hidatsa & Arikara Nation v. U.S. Department of the Interior*, 95 F.4th 573 (8th Cir. 2024), Defendants lack the authority to regulate groundwater appropriations by non-Indians on lands owned by non-Indians within the Reservation. Under this same precedent, Defendants also lack the

---

[4] In the report of expert hydrogeologist Jeffrey Davis, which is attached hereto as Exhibit 1 ("Davis Report"), the Study Area is a defined area that includes the RDO Lands subject to the Water Ordinance and the area monitored in the SRGWMA. The Davis Report analyzes and opines on the impact of RDO's farming activities in the Study Area, which includes climatologic, physiographic, geologic, hydrogeologic, and hydrologic features of importance that inform Mr. Davis's opinions. Specifically, the Study Area spans four counties (all of Becker County with smaller portions in Hubbard, Clearwater, and Wadena Counties), covering approximately 627 square miles and incorporating the Otter Tail River and Crow Wing River watersheds. These watersheds create surface water and shallow groundwater divides and form natural flow boundaries. *See* Ex. 1 (Davis Report) at 4-1; *see also* Figure 1, *infra*.

authority to regulate groundwater appropriations by non-Indians *outside* the Reservation as Defendants are trying to do. *See Hornell Brewing Co. v. Rosebud Sioux Tribal Ct.*, 133 F.3d 1087, 1091 (8th Cir. 1998) ("Neither *Montana* nor its progeny purports to allow Indian tribes to exercise civil jurisdiction over the activities or conduct of non-Indians occurring *outside their reservations*.") (emphasis in original)).

Despite their lack of authority to do so, Defendants are regulating groundwater withdrawals through the Water Ordinance, which poses an immediate threat to RDO Farms. RDO Farms must either submit to the Water Ordinance by May 5, 2024, by applying for a permit with Defendants (which may be arbitrarily denied or needlessly delayed in a three-year decision-making process that is simply not conducive to a farmer's growing season and decision-making), or run the catastrophic risk of not being able to cultivate and harvest its potato crops during this growing season despite holding MN DNR-issued water appropriation permits for the RDO Lands.

A Declaratory Judgment is appropriate here not only because the Water Ordinance cannot apply to RDO under applicable Supreme Court precedent such as *Montana* and *Plains Commerce Bank*, but also because it is wholly unnecessary.

## NATURE OF THE ACTION

In support of this request for Declaratory Judgment, Plaintiff RDO asserts as follows:

1.      Plaintiff RDO seeks a Declaratory Judgment that: (a) Defendants lack legal authority to regulate RDO's water use on RDO Lands within the Reservation; (b) Defendants lack legal authority to regulate RDO's water use on RDO Lands located outside

7

of the Reservation within the five-mile appurtenant area; and (c) RDO is not required to apply for or obtain a groundwater appropriation permit or any other permit from Defendants.

2.      Despite the lack of credible scientific evidence of a meaningful threat to the groundwater within the Reservation, the WERBC passed the Water Ordinance on May 5, 2023. The Water Ordinance requires landowners and farm operators, including non-Indian landowners and farm operators, who already hold valid MN DNR groundwater appropriation permits to submit permit applications to Defendants within one year for all high-capacity pumps and wells located both on the Reservation and within the surrounding five-mile area. This new Water Ordinance is unnecessary in light of: (a) MN DNR's comprehensive regulatory program related to groundwater appropriation permits and the sustainability of groundwater resources; and (b) the lack of scientific evidence of a meaningful threat to groundwater aquifers in the area within the Reservation where Plaintiff RDO Farms has been farming for 40 years.

3.      Plaintiff RDO has been farming on lands located both within the Reservation and outside the Reservation in the five-mile appurtenant area for 40 years.

4.      All RDO Lands on the Reservation and in the five-mile area outside of the Reservation are included in the Study Area and are also within the specially designated Straight River Groundwater Management Area as demonstrated by the map in Figure 1.

**Figure 1.**



5.     Throughout its long history of farming in the Study Area, RDO has been committed to serving as a good steward of the land, employing state-of-the-art practices to ensure sustainability.

6.     RDO's sustainability practices are effective. Analysis of groundwater levels since 1988 shows that water quantity in the Study Area has not been negatively impacted by agricultural activity. In fact, groundwater levels have remained stable even though groundwater usage and withdrawals have increased during this period.

7.     Jeffrey Davis, an expert hydrogeologist from Integral Consulting Inc. ("Integral"), has evaluated substantial data from the Study Area and developed and calibrated a predictive model based on that data. Based on this evaluation and his expertise, Mr. Davis's opinions are:

(1) MN DNR is proactively managing the groundwater resource;

(2) Groundwater levels do not show any long-term decline despite increased irrigation in the Study Area;

(3) RDO Farms' operations do not affect lake levels or stream flow; and

(4) RDO Farms' current and historical groundwater withdrawals are sustainable.

See Ex. 1 (Davis Report) at 6.1-6.4.

8.     That groundwater levels have remained stable is not surprising. The State has numerous agencies, regulations, and programs committed to protecting Minnesota's waters,[5] including MN DNR's comprehensive permitting process to regulate water use.

---

[5] Per the Legislature, the "responsibility for the protection of groundwater in Minnesota is vested in a multiagency approach to management." Minn. Stat. § 103A.204(a). The responsible agencies include: (1) Environmental Quality Board (coordination of state groundwater protection programs); (2) Pollution Control Agency (water quality monitoring and reporting and development of best management practices and regulatory mechanisms related to nonagricultural chemical contaminants); (3) Department of Agriculture (sustainable agriculture, integrated pest management, water quality monitoring, and development of best management practices and regulatory mechanisms related to agricultural chemical contaminants); (4) Board of Water and Soil Resources (reporting on groundwater education and outreach with local government officials, local water planning and management, and local cost-share programs); (5) Department of Natural Resources: (water quantity monitoring and regulation, sensitivity mapping, and development of a plan for the use of integrated pest management and sustainable agriculture on state-owned

9.      In 2017, pursuant to Minn. Stat. § 103G.287, subd. 4, MN DNR designated an area surrounding the Straight River as a groundwater management area, allowing the agency to more closely monitor and limit, if necessary, the total groundwater appropriations and uses in the management area based on its findings. The SRGWMA designation and the approved SRGWMA Plan ensure that groundwater use within the SRGWMA remains sustainable.

10.      In April 2024, MN DNR published the findings from its years of monitoring of the SRGWMA in the Straight River Groundwater Report, which demonstrates that the SRGWMA Plan is functioning just as it should, and water quantity continues to remain stable. *See* Ex. 4 (Straight River Groundwater Report) at 58. Specifically, the Straight River Groundwater Report concludes:

- Aquifer levels have been stable and resilient through the extensive period of record, and the DNR is not concerned about long-term aquifer sustainability. *Id.* at 58.

- Summer streamflow at the outlet of the SRGWMA has shown no downward trend. *Id.*

11.      State regulation, coupled with RDO's and others'[6] commitment to sustainable practices, are working to protect and sustain the State's water resources.

---

lands); and (6) Department of Health (regulation of wells and borings, and development of health risk limits under section 103H.201). *Id.*

[6] Many stakeholders in Minnesota have an interest in the sustainability of Minnesota's water resources, including local soil and water conservation districts, watershed districts, residents, farmers, recreational users, and researchers. These stakeholders often work in tandem to develop and implement sustainable practices. For example, the University of Minnesota conducts extensive research on sustainable agriculture, promulgating best practices that are often implemented by RDO and other farmers throughout the state.

12.     Despite the myriad data, reporting, and other evidence establishing the effectiveness of State and private efforts to protect water resources in and around the Study Area, Defendants are brazenly proclaiming in public filings that their regulations *preempt* the State's statutory authority to regulate the use of water not just on Reservation land but also within the five-mile area surrounding the Reservation. Specifically, in Tribal Court filings on a matter seeking to enforce the Water Ordinance against another farmer, Defendants have declared:

> As it relates to water rights provided to the Band by federal treaty, State regulatory authority . . . is ***preempted and "of no force and effect. . . ."*** [T]he State of Minnesota's actions in this area are preempted as they relate to waters on and appurtenant to the Reservation to which the Band has federal reserved water property rights.

*See* Exhibit 5 (Initial Status Report) (emphasis added). Defendants are essentially claiming that they have the authority to eliminate the State's power to regulate water within the State (something the State has done effectively for nearly 100 years) and preemptively take over from the State the regulation of non-Indians' conduct on non-Indian owned lands as it pertains to water use both on and outside of the Reservation.

13.     Defendants' position flies in the face of decades of federal law. The *Montana* doctrine outlined in a 1981 Supreme Court decision restricts a tribe's exercise of authority over the conduct of non-Indians on fee lands owned by non-Indians within its reservation unless "that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Montana*, 450 U.S. at 566. Supreme Court precedent requires that conduct to be "*catastrophic* for tribal self-government" before allowing the tribe to exercise authority. *Plains Commerce Bank*, 554

U.S. at 341 (2008) (emphasis added). And the *Montana* doctrine says nothing about tribal authority to regulate *non-Reservation* land, which Defendants also are attempting to regulate here.

14.     Notably, if every tribe asserted preemptive authority to regulate water on its Reservation and a five-mile appurtenant area, the result would be a complicated patchwork of potentially inconsistent and conflicting regulations throughout Minnesota subjecting landowners and operators to confusing and unnecessary permitting processes.

15.     The scientific, fact-based evidence found in both the Straight River Groundwater Report prepared by MN DNR and the Davis Report demonstrates that RDO's farming operations on RDO Lands both within the Reservation and in the five-mile appurtenant area outside the Reservation do not threaten or have a direct effect on "the political integrity, the economic security, or the health and welfare of the tribe."

16.     Despite Defendants' plain lack of authority or any scientific basis to regulate RDO's water use, RDO believes Defendants intend to enforce the Water Ordinance against RDO on or around the date set forth in the Water Ordinance by which those with existing permits are purportedly required to apply for a permit with Defendants —May 5, 2024. In fact, Defendants have already sought to enforce the Water Ordinance against another non-Indian farmer who applied for and received a new MN DNR permit to pump water on fee land he owns within the Reservation.[7] Defendants' ongoing action in Tribal Court seeks a

---

[7] Under the terms of the Water Ordinance, high-capacity wells and pumps not in existence or operation as of the effective date (May 5, 2023) are not allowed to operate without a permit from Defendants, whereas owners and operators of existing high-capacity wells and

declaratory judgment that the farmer may not install a pump without a permit from Defendants and that the Water Ordinance governs the extent to which the farmer can pump from the Wild Rice River, which is within the geographic scope covered by the Water Ordinance.

17.     Even though RDO already has permits issued by MN DNR, the Water Ordinance purports to require RDO to prepare and submit Existing Source permit applications by May 5, 2024. Given Defendants' enforcement of the Water Ordinance and its extreme and unwarranted position on its right to preempt the State's authority to regulate water both on and outside of the Reservation, RDO believes that Defendants have RDO in their crosshairs for suit as soon as the May 5th deadline passes.

18.     RDO Farms will face unacceptable uncertainty and could suffer irreparable harm if this Court does not act promptly on the request for a Declaratory Judgment. RDO Farms has an interest in 5,991.9 acres of land within the Reservation and the appurtenant five-mile area as either an owner or a tenant for the 2024 growing season, including growing 675 acres of potatoes within the Reservation and 883 acres of potatoes within the five-mile appurtenant area. The entire 2024 crop is contractually committed to food providers. If Defendants seek to enforce their impermissible Water Ordinance by taking action within the Tribal Courts, then RDO Farms could be forced to shut down its operations without the groundwater needed for irrigation of its crops, which is approved for withdrawal by MN DNR.

---

pumps are required to submit permit applications within one year of the effective date of the Ordinance (May 5, 2024) ("Existing Source permit").

19.     Furthermore, RDO's growing cycle begins years in advance of actual planting with seeds for the current season's crop being purchased 5-7 years prior. Uncertainty around RDO's ability to irrigate impacts not just the current growing season but also the growing seasons for years to come.

20.     Thus, this matter is ripe for review in this Court now, and RDO respectfully requests the Court issue a Declaratory Judgment that Defendants lack authority to regulate RDO's water use on the Reservation and in the five-mile appurtenant area and that RDO is not required to apply for or obtain a permit from Defendants.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over this matter under 28 U.S.C. § 1331 because whether a tribe or its agencies have authority to regulate conduct by a non-Indian person or entity on fee land within its Reservation and on land outside of the Reservation is a federal question. *See Plains Commerce Bank*, 554 U.S. at 324 ("We begin by noting that whether a tribal court has adjudicative authority over nonmembers is a federal question."); *see also In re Otter Tail Power Co.*, 116 F.3d 1207, 1214 (8th Cir. 1997) ("[T]he extent of an Indian Tribe's authority to regulate nonmembers on a reservation, whether the source of that authority is based on treaty rights, acts of Congress, or inherent tribal sovereignty, is manifestly a federal question.").

22.     Venue in this District is proper under 28 U.S.C. § 1391(b) because Defendants are located within the United States District Court for the District of Minnesota and because a substantial part of the events or omissions giving rise to this claim is occurring there.

23.     An actual case and controversy exist between the parties as hereinafter alleged, warranting the Court's declaration pursuant to 28 U.S.C. § 2201. This case and controversy are ripe because the Water Ordinance commands that RDO obtain groundwater appropriation permits by May 5, 2024, or be subject to enforcement actions that could prevent RDO from using state-authorized groundwater withdrawals to irrigate its crops on RDO Lands within the Reservation and outside the Reservation for the 2024 growing season, thereby causing RDO substantial and irreparable harm.

24.     Specifically, on information and belief, Defendants intend to require RDO to first obtain permits under the Water Ordinance before watering crops, despite the fact that RDO Farms already has permits issued by MN DNR to irrigate on the RDO Lands on the Reservation and in the five-mile appurtenant area. If RDO Farms does not comply with Defendants' regulation, then Defendants are likely to seek a preliminary injunction from the White Earth District Court consistent with their actions taken to date against the other farmer – David Vipond.

25.     Defendants do not have authority to regulate RDO's groundwater use on the RDO Lands it owns or operates within the Reservation and outside the Reservation in the five-mile appurtenant area.

26.     The looming enforcement of the Water Ordinance is a serious concern for RDO creating uncertainty in its ability to farm the RDO Lands and resulting in harm to RDO, its employees, and the community. RDO is not alone in this harm. Recently,

Minnesota state legislators alerted the public to the burden created by the Water Ordinance, expressing their concern over the Tribe's overreach.[8]

27.     Exhaustion of Tribal Court remedies is not required. As an initial matter, exhaustion is only a prudential rule, not a prerequisite for this Court to exercise jurisdiction.

28.     Exhaustion is not required where it would be futile or serve no purpose other than to delay resolution of this action. This is particularly true where Defendants' authority to regulate RDO's groundwater withdrawals from RDO Lands is barred by clear United States Supreme Court precedent. *See Montana*, 450 U.S. at 566; *Plains Commerce Bank*, 554 U.S. at 341 (2008).

29.     Exhaustion is not required when Defendants' unauthorized actions threaten to destroy the crops that are to be imminently planted by RDO Farms and that are all contractually committed for the 2024 growing season.

30.     For example, if the White Earth District Court were to enjoin RDO from irrigating the RDO Lands on the Reservation and within the five-mile appurtenant area, despite having validly issued State water appropriation permits, RDO will not be able to irrigate its 2024 crops, which will cause significant damage to or loss of the crops, resulting in substantial financial losses.

31.     Exhaustion is not required where the absence of Tribal Court authority is as plain as it is here, particularly in light of Defendants' efforts to regulate non-Indians on

---

[8] *See* Sen. Steve Green, Rep. Matt Bliss, and Rep. Jim Joy, Opinion, *White Earth Farm Permitting Issues Raise Serious Jurisdictional Concerns*, DL-Online, March 26, 2024, https://www.dl-online.com/opinion/letters/letter-white-earth-farm-permitting-issues-raise-serious-jurisdictional-concerns.

non-Indian owned land both within and outside of the Reservation. *See Hornell*, 133 F.3d at 1091 ("Neither *Montana* nor its progeny purports to allow Indian tribes to exercise civil jurisdiction over the activities or conduct of non-Indians occurring *outside their reservations*.") (emphasis in original).

## PARTIES

32.     Plaintiff RDO is a family-owned and operated business, headquartered in Fargo, North Dakota. RDO has farmed land in Minnesota for the last 60[9] years.

33.     Defendant WEDNR is located at 102 3rd St NE, Mahnomen, MN 56557, which is located on the Reservation within the borders of the State of Minnesota.

34.     Defendant Dustin Roy, in his official capacity as the Director of WEDNR, is an enrolled member of the White Earth Band of the Minnesota Chippewa Tribe. On information and belief, Mr. Roy is a resident of Minnesota.

35.     Defendants John Does, in their official capacities as WEDNR Conservation Officers, are enrolled members of the White Earth Band of the Minnesota Chippewa Tribe. On information and belief, John Does are residents of Minnesota.

## FACTUAL BACKGROUND

### A.     RDO

36.     RDO has farmed land it owns and/or leases in Minnesota, including land within the Reservation and the five-mile appurtenant area outside the Reservation for 40 years.

---

[9] RDO has farmed land it owns or leases within the boundaries of the Reservation and five-mile appurtenant area for 40 years.

37.     During that time, RDO has been a good steward of the land, committed to developing and investing in technology and fact-based sustainable practices that are proven through extensive monitoring, testing, and analysis.

38.     RDO has optimized its irrigation equipment for efficiency, using precision center-pivot irrigators and low-pressure nozzles. This allows RDO to minimize water lost to evaporation, maximize water available to growing crops, and conserve water and power.

39.     RDO also uses state-of-the-art technology to ensure real-time monitoring and adjustments, including remote soil moisture probes, autonomous pivots that pull moisture samples every thirty minutes, scheduling tools that account for daily weather fluctuations and evaporation metrics, and remote flow meters. RDO Farms' close monitoring on a day-by-day, field-by-field basis allows its farm managers to rely on real-time data and appropriately and timely adjust irrigation practices.

40.     RDO also employs best practices to ensure that it puts into the soil only as much nutrient and water as is needed by the crop. When appropriate, RDO places a nutrient band around each seed, next to roots rather than broadcasting fertilizer across an entire field, to reduce potential nutrient waste.

**B.**     **The Data Shows that the Water Contained Within the Study Area is Adequately Protected.**

41.     Water levels under RDO Lands and the surrounding area have remained stable for decades, despite increased withdrawals. *See* Ex. 4 (Straight River Groundwater Report). The Straight River Groundwater Report, recently published by MN DNR and based on monitoring data collected since 2017, concludes that any impacts related to

groundwater withdrawals within the area of review are temporary because of replenishment with no long-term sustainability concerns. Specifically, it found that the wells in the SRGWMA (including RDO Lands, *see* Figure 1, *supra*) that do have seasonal drawdowns in groundwater levels regularly recover in early fall after the completion of the irrigation season. In other words, the net loss from withdrawals is offset by recharge of the aquifers.

42.     In addition, hydrogeologist Jeffrey Davis of Integral analyzed the impact of irrigation activities on groundwater and surface water in the Study Area. *See* Ex. 1.

43.     Mr. Davis's analysis and modeling is based on monthly groundwater withdrawal data maintained by MN DNR from 2013 to 2023, and is used to evaluate any historical impact as well as to simulate future impacts based on possible scenarios.

44.     Mr. Davis's report confirms the following:

- MN DNR is proactively managing the groundwater resource;

- Groundwater levels show no long-term decline despite increased irrigation (or water use) in the Study Area;

- RDO Farms' operations do not affect lake levels or stream flow; and

- RDO Farms' current and historical groundwater withdrawals are sustainable.

*See* Ex. 1 (Davis Report) at 6.1-6.4

45.     Mr. Davis's opinions are supported by his comprehensive analysis based on years of historical data as set forth in the Davis Report. Ex. 1 (Davis Report) at 6.1-6.4.

C.     **The State Effectively Protects and Conserves the Waters within Minnesota.**

     *1.     MN DNR Permitting*

46.     In addition to its own commitment to sustainability, RDO also complies with State regulatory requirements for groundwater use implemented and enforced by MN DNR. Under Minnesota law, the State has exclusive jurisdiction to regulate waters within Minnesota's borders. Minn. Stat. § 1.01.

47.     State law requires MN DNR to manage water resources to ensure an adequate supply to meet long-term seasonal requirements for domestic, agricultural, fish and wildlife, recreational, power, navigation, and quality control purposes.

48.     To that end, MN DNR requires all users withdrawing more than 10,000 gallons of water per day or 1 million gallons per year to obtain a water appropriation permit. In order to obtain that permit, an applicant needs to submit to MN DNR:

     A. A completed application;

     B. The application fee of $150;

     C. Aerial photographs, maps, sketches, detailed plat, topographic maps, or other descriptive data sufficient to show:

          (1) the location of the area of use;

          (2) the outline of the property owned, or controlled by the applicant in proximity to the area of use;

          (3) the location of the proposed point of appropriation such as well(s) location, stream bank pump(s) or the location of other facilities for appropriation of water;

          (4) if ground water is involved, the location of test hole borings which have been drilled on the property from which the appropriation will be made.

D. Signed statement that copies have been sent to the mayor of the city, secretary of the board of supervisors of the soil and water conservation district, or the secretary of the board of managers of the watershed district if the proposed project is within a city or within or affects a watershed district or soil and water conservation district or a city;

E. Statement of justification supporting the reasonableness and practicality of use with respect to adequacy of the water source, amounts of use, and purposes, including available facts on:

 (1) hydrology and hydraulics of the water sources involved, including for surface waters the applicant's analysis of the effect of proposed withdrawals on levels and flows and anticipated impacts, if any, on instream flow or lake level conditions to the extent that such facts are not already available to the commissioner;

 (2) proposed pumping schedule including rates, times, and duration;

 (3) amounts of water to be appropriated on a maximum daily, monthly, and annual basis;

 (4) means, methods, and techniques of appropriation;

 (5) alternative sources of water or methods which were considered, to attain the appropriation objective and why the particular alternative proposed in the application was selected.

F. Information on any water storage facilities and capabilities and any proposed reuse and conservation practices.

G. Application for use of surface water shall include the following additional data:

 (1) A contingency plan that is "feasible, reasonable, and practical" for if appropriation is restricted to meet instream flow needs or to protect the level of a basin, or a statement agreeing in such case to withstand the results of no appropriation;

 (2) For appropriation from natural basins or natural watercourses, facts to show that reasonable alternatives for appropriating water have been considered including use of water appropriated during high flows and levels and stored for later use and the use of ground water.

(3) For basins less than 500 acres in surface area the applicant shall notify all riparian landowners and provide the commissioner with a list of all landowners notified; attempt to obtain a signed statement from as many riparian landowners as the applicant is able to obtain stating their support to the proposed appropriation; and provide an accounting of number of signatures of riparian owners the applicant is unable to obtain.

*See* Minn. Admin. Rule 6115.0660.

49.     The Minnesota Administrative Rules also require additional information and

conditions for agricultural irrigation:

A. If the application is for use of groundwater from an aquifer system for which adequate groundwater availability data are available and therefore is designated by the commissioner as a Class A application, an applicant must provide:

(1) copies of test hole log(s) to identify the aquifer the proposed well will penetrate;

(2) copies of the water well record(s) and production test data;

(3) additional aquifer test data as may be required by the commissioner if the test holes, water well records, and production test data are insufficient to allow the commissioner to properly assess the capability of the aquifer system in the area of withdrawal, or are inadequate to allow assessment of the effects of the proposed appropriation on other nearby wells.

B. If the application is for use of groundwater from an aquifer system for which inadequate groundwater availability data are available and therefore is designated by the commissioner as a Class B application, an applicant must provide:

(1) copies of test hole log(s) to identify the aquifer the proposed well will penetrate;

(2) copies of water well record(s) and production test data;

(3) the anticipated groundwater quality in terms of the measures of quality commonly specified for the proposed water use, when existing data indicate the water supply is not suitable for irrigation;

(4) the location of each domestic well, for which information is readily available, located within the area of influence or within 1-1/2 mile radius of the proposed irrigation well, whichever is less;

(5) readily available information from water well records, reports, studies, and field measurements regarding the domestic wells within the area of influence or a 1-1/2 mile radius of the proposed irrigation well whichever is less, such as:

> (a) owner's name, address, and phone number;

> (b) depth of well in feet;

> (c) diameter of well and casing type (concrete curb, steel, wooden, clay tile, etc.);

> (d) nonpumping water level (in feet) below land surface;

> (e) age of well (when constructed);

> (f) type of pump (shallow-jet, deep well jet, submersible reciprocating, etc.) and rate of discharge; and

> (g) length of drop pipe in well;

(6) results of a pumping test of the aquifer system.

*See* Minn. Admin. Rule 6115.0680.

50.    All permitted groundwater users are required to submit annual reports of groundwater use.

51.    RDO Farms has applied for and received permits for its groundwater appropriations, meaning it cannot use more than the amount of groundwater designated for each permit by MN DNR. In fact, RDO has withdrawn *less* than the permitted amount 98.4% of time over the course of 34 years of available data from MN DNR.

24

**2.      *Straight River Groundwater Management Area***

52.      In addition to issuing permits, the State and, in particular, MN DNR protects

Minnesota waters in other ways. In 2017, MN DNR designated the SRGWMA to analyze

potential overuse and water quality issues:

> As part of a statewide analysis of groundwater resources, the DNR identified
> the Straight River area as an area of specific concern where groundwater
> resources are at risk of overuse and degraded quality. Multiple permit holders
> (groundwater users) are connected through their use of groundwater and their
> effect on water resources.

*See* Ex. 3 (SRGWMA Plan) at 1-2.

53.      The SRGWMA has significant overlap with the Study Area and encompasses

the RDO Lands entirely, as shown by the map in Figure 2.

**Figure 2.**



○ RDO Permit
● Non_RDO Permit
- - Sub-Management Area
▢ 5-mile Buffer around White Earth
▢ White Earth Tribal Boundary
▢ Straight River Groundwater Management Area

54.     Among other things, by designating the SRGWMA, MN DNR sought to closely monitor and establish actions to "guide the improvement of MN DNR's appropriation permitting process to ensure sustainable groundwater use" and to develop "sustainability thresholds for groundwater use in the GWMA." *See* Ex. 3 (SRGWMA Plan) at 1-2.

55.     In 2024, MN DNR issued the Straight River Groundwater Report analyzing the data extrapolated from five years of monitoring and analysis related to the SRGWMA designation. *See* Ex. 4 (Straight River Groundwater Report).

56.     The Straight River Groundwater Report supports the conclusions in the Davis Report. Specifically, the Straight River Groundwater Report concludes that although water appropriations have more than doubled in a 33-year period within the SRGWMA, **the scientific data indicates there are no long-term sustainability concerns and that safe yield**[10] **thresholds are not being exceeded in the confined or water table**

---

[10] Safe yield is defined in the SRGWMA Plan by reference to Minnesota Administrative Rules for both the water table and the artesian conditions, which include the following definitions: "'Safe yield for water table condition' means the amount of groundwater that can be withdrawn from an aquifer system without degrading the quality of water in the aquifer and without allowing the long term average withdrawal to exceed the available long term average recharge to the aquifer system based on representative climatic conditions."

**aquifers—indicating that there is no unsustainable overuse**. Ex. 4 (Straight River Groundwater Report) at 51, 58.

**D.      Defendants Improperly Purport to Usurp the State's Authority to Regulate Waters Throughout the State.**

57.      Despite the latest, comprehensive scientific evidence contradicting the necessity of yet another ordinance to regulate groundwater use, WERBC forged ahead with enacting an ordinance purporting to regulate land already regulated by MN DNR and indeed land that largely overlaps with the SRGWMA—an area that MN DNR has specially designated as part of the 2017 SRGWMA Plan and that has been found to have not experienced any material impact on groundwater availability.

**1.      *The Water Ordinance***

58.      On May 5, 2023, WERBC enacted the Water Ordinance requiring landowners and operators of high-capacity wells and pumps on the Reservation *and* outside the Reservation within the five-mile appurtenant area to submit permit applications to Defendants within one year of the Water Ordinance's effective date.

59.      The Water Ordinance purports to govern ground and surface waters both on and within a five-mile area appurtenant to the Reservation, banning all high-capacity wells and pumps within the Study Area that have not received a permit from Defendants. *See* Ex. 2, §§ 5.1, 5.2.

---

Minn. Admin. Rule 6115.0630, subp. 15. "'Safe yield for artesian condition' means the amount of groundwater that can be withdrawn from an aquifer system without degrading the quality of water in the aquifer and without the progressive decline in water pressures and levels to a degree which will result in a change from artesian condition to water table condition." *Id.* at subp. 16.

60.     Defendants' permitting program attempts to cover appropriations of more than 10,000 gallons of water per day or more than 1 million gallons of water per year within the Reservation and outside the Reservation in the surrounding five-mile appurtenant area.[11] Notably, Defendants' volume requirements for a permit match those of MN DNR.

61.     Pursuant to the Water Ordinance, persons intending to install or operate a high-capacity groundwater well or surface water pump on the Reservation or within the five-mile appurtenant area must apply to Defendants for a permit. The Water Ordinance does not supplant permit requirements that already exist under Minnesota state law.

62.     RDO currently withdraws groundwater from RDO Lands, located both on non-Indian fee land within the Reservation and non-Reservation land located within the "five-mile buffer area" outside of the Reservation.

63.     Currently, RDO holds permits from MN DNR and operates approximately 37 wells within the Study Area.

64.     The Water Ordinance unilaterally, and without valid scientific justification or legal authority, seeks to ban the operation of these existing wells, referred to as "Existing Sources" in the Ordinance, without a permit from Defendants—notwithstanding their MN DNR permits. *See* Ex. 2, § 5.2.

---

[11] Notably, the Water Ordinance also imposes requirements on landowners and operators related to the impact of groundwater use within five miles of each individual well, thus extending its reach even *beyond* the five-mile non-Reservation area. *See, e.g.*, Ex. 2, § 8.3(a) ("Operations, when evaluated individually or cumulatively, shall not cause a significant reduction in the quantity of groundwater available for reasonable use by current groundwater users within 5 miles. A significant reduction includes a drop in the water table that results in a substantial adverse impact on a private or municipal well including but not limited to the inability of a well to provide water on a continuous basis.").

65.     It does, however, distinguish between its treatment of "Existing Sources" and "New Sources." The Water Ordinance banned New Sources as of the effective date, May 5, 2023, but gave owners of Existing Sources one year from the effective date, until May 5, 2024, to apply for a permit with Defendants.

66.     Under the Water Ordinance, if a landowner or operator submits a permit application, Defendants claim to have the unilateral authority to prevent landowners and operators from using groundwater pending their review of the permit application for up to three years after the Water Ordinance's effective date.[12] Ex. 2, § 5.2(b).

67.     The Water Ordinance also requires excessive fees, including a $5,000 application fee, reimbursement of staff time and expert review time spent reviewing, processing, and acting upon Permits, and "*any additional costs* necessary to complete Permit review." *Id.* at § 6.2 (emphasis added).

68.     In sum, the Water Ordinance allows Defendants to charge exorbitant fees, "request[] additional information" from any permit applicant, review that application for years while continuing to prevent the applicant from operating, and then deny the permit application—leaving the applicant's operations in purgatory for years only to reject a permit altogether.

---

[12]The Water Ordinance ostensibly allows landowners and operators to "continue operation" in accordance with its permit application but allows them to do so only until Defendants request "additional information required to determine compliance with this Ordinance or takes final action approving or denying the Permit application." Ex. 2, § 5.2(b).

69.     If RDO fails to comply with the uncertain and burdensome process contemplated by the Water Ordinance, the Ordinance purports to prohibit RDO from withdrawing any groundwater from RDO Lands within the Reservation and outside the Reservation in the five-mile appurtenant area. If RDO cannot withdraw groundwater, it cannot irrigate its crops, which are to be planted imminently for the 2024 growing season and which are already presold pursuant to RDO contracts.

70.     All of these requirements are in addition to MN DNR's permitting process. Indeed, on information and belief, MN DNR has not accepted Defendants' statements that Defendants' authority under the Water Ordinance preempts the State's exclusive authority afforded by statute to regulate the State's waters. Thus, under State law, RDO must continue to comply with MN DNR regulations.

### 2.     *Defendants' Attempt to Enforce the Water Ordinance*

71.     That Defendants intend to enforce the Water Ordinance strictly is not simply a hypothetical as evidenced by Defendants' recent actions. On August 23, 2023, WEDNR filed suit against David Vipond in the White Earth District Court for a declaratory judgment that Mr. Vipond may not install a pump without a permit from WEDNR and that the Water Ordinance governs the extent to which Mr. Vipond can pump from the Wild Rice River.

72.     On information and belief, Mr. Vipond is a non-Indian farmer who owns fee land on the Reservation and applied for a permit with MN DNR to operate a surface water pump after or around the time the Water Ordinance was passed, making the Ordinance effective immediately as to Mr. Vipond.

73.    After receiving notice of Mr. Vipond's permit application, Defendant Roy objected to the permit with MN DNR and notified MN DNR of the Water Ordinance. On two separate occasions, Roy also drafted notices to Mr. Vipond, which were hand-delivered to Mr. Vipond on both occasions by Defendants John Does, in their official capacity as Conservation Officers, alerting him to the Water Ordinance.

74.    Despite Defendants' objections, MN DNR nevertheless issued a permit to Mr. Vipond on August 11, 2023.

75.    WEDNR subsequently sued Mr. Vipond in the White Earth District Court and sought a preliminary injunction, serving Mr. Vipond with a Summons, Complaint, Motion for Preliminary Injunction, the affidavit of Defendant Roy along with two other affidavits and one declaration on September 1, 2023, the Friday before Labor Day Weekend. The Summons gave Mr. Vipond 30 days to respond. Just six business days later, however, on September 12, 2023, the White Earth District Court issued a preliminary injunction, enjoining Mr. Vipond from installing or operating a pump on his land, without giving Mr. Vipond notice or any opportunity to respond.

76.    Mr. Vipond appealed the White Earth District Court's preliminary injunction to the White Earth Court of Appeals. On October 24, 2023, the Court of Appeals issued an order, noting its concerns with the White Earth District Court's failure to give Mr. Vipond notice, an opportunity respond, or a hearing, despite the White Earth Rules of Civil Procedure clearly requiring time to respond. It also noted jurisdictional concerns.

77.    The White Earth Court of Appeals remanded the case, treating the preliminary injunction as a temporary restraining order and allowing it to remain in place,

31

but ordering the White Earth District Court to schedule a hearing within 30 days "unless the parties or the Court agree to extend that period." The Court of Appeals also ordered the District Court to make detailed findings on jurisdiction in determining whether to issue a preliminary injunction.

78.     The parties did not agree to extend the period for the hearing beyond 30 days. Nonetheless, WEDNR submitted an Initial Status Report, proposing a briefing schedule solely on the jurisdiction issue and a hearing for June 2024. *See* Ex. 5 (Initial Status Report). The White Earth District Court adopted the schedule submitted by WEDNR in its entirety, including the hearing date of almost eight months after the Court of Appeals ordered it do so, and has not yet held a hearing.

79.     Although the White Earth District Court dissolved the temporary restraining order, it allowed WEDNR to file another Motion for Preliminary Injunction. Rather than go through that process, on information and belief, Defendants and Mr. Vipond reached an agreement under which he would not pump water on his land for the time being.

### 3.     *Defendants' Attempt to Usurp MN DNR's Authority*

80.     Defendants' filings and correspondence in the Vipond matter reveal its unprecedented legal position. In its Initial Status Report submitted to the White Earth District Court, WEDNR asserted two grounds for asserting authority to regulate under the Water Ordinance.

81.     First, Defendants claim that their authority *preempts* the State's right to regulate land and waters on and appurtenant to the Reservation, which encompasses RDO Lands and other non-Indian owned lands, based on alleged federal water rights:

32

> As it relates to water rights provided to the Band by federal treaty, State regulatory authority . . . is ***preempted and "of no force and effect*** . . . ." [T]he State of Minnesota's actions in this area are preempted as they relate to waters on and appurtenant to the Reservation to which the Band has federal reserved water property rights.

Ex. 5 (Initial Status Report) at 4 (emphasis added).

82.    On information and belief, MN DNR has not agreed that Defendants' purported authority preempts the State's regulatory authority. Indeed, MN DNR issued Mr. Vipond's permit in the face of Defendants' objections based on the Water Ordinance.

83.    Second, Defendants claim authority under the second exception to the *Montana* doctrine, which permits a tribe to regulate the conduct of non-Indians on fee land within the Reservation only "when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Montana*, 450 U.S. at 566.

84.    In Tribal Court filings, Defendants incorrectly minimize the burden they carry in establishing its power to regulate non-Indians. Conceding only that invoking the second *Montana* exception as a ground for such power is a "difficult one,"[13] Defendants fail to acknowledge the Supreme Court precedent requiring that conduct to be "*catastrophic* for tribal self-government" before a tribe may exercise regulatory power over non-Indians. *See Plains Commerce Bank*, 554 U.S. at 341 (emphasis added). And the *Montana* doctrine says nothing about *non-Reservation* land, which Defendants also are attempting to regulate here.

---

[13] *See* Ex. 5 (Initial Status Report) at 5.

## COUNT I: DECLARATORY JUDGMENT

85.     Each and every allegation contained in the foregoing Paragraphs of this Complaint is realleged and incorporated by reference as if set forth fully herein.

86.     There is an actual, ripe, and immediate controversy between RDO and Defendants regarding Defendants' authority to regulate water use by RDO—a non-Indian—on both non-Indian fee land within the Reservation and land owned by RDO off the Reservation purportedly subject to regulation under the Water Ordinance.

87.     Under 28 U.S.C. § 2201, an actual case or controversy exists in light of RDO's inability to undertake planning and operations for the extensive land it owns and the people it employs due to enforcement of the Water Ordinance and the potential that it might prevent RDO from watering crops in the relevant area for years.

88.     RDO seeks a judgment from this Court declaring that Defendants lack authority to regulate RDO's water use on the Reservation and in the five-mile appurtenant area and that RDO is not required to apply for or obtain a permit from Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff R.D. Offutt Farms Co. respectfully requests that the Court enter judgment in its favor and against Defendants declaring that: (a) Defendants lack legal authority to regulate RDO's water use on RDO Lands within the Reservation; (b) Defendants lack Defendants legal authority to regulate RDO's water use on RDO Lands located outside of the Reservation within the five-mile appurtenant area; and (c) RDO is not required to apply for or obtain a groundwater appropriation permit or any other permit from Defendants .

In addition, RDO respectfully requests such other and further relief as the Court deems just and appropriate, including an award of attorneys' fees and costs.

Dated: May 3, 2024                    **SAUL EWING LLP**

By:   *Erin Westbrook*
      Erin Westbrook (MN #0393072)
      33 South Sixth Street, Suite 4750
      Minneapolis, MN 55402
      Telephone: (612) 225-2800
      Email: erin.westbrook@saul.com

      John F. Stoviak
      (*Pro Hac Vice* filed herewith)
      1200 Liberty Ridge Drive
      Suite 200
      Wayne, PA 19087-5569
      Telephone: 610-251-5056
      Mobile: 215-460-2944
      Email: john.stoviak@saul.com

      *Attorneys for Plaintiff R.D. Offutt Farms Co.*